The Western Colorado Producers Cooperative, a Corporation v. Commissioner.
Western Colorado Producers Coop. v. Commissioner
Docket No. 110220.
United States Tax Court
1943 Tax Ct. Memo LEXIS 491; 1 T.C.M. (CCH) 697; T.C.M. (RIA) 43107; January 27, 1943
*491 Samuel G. McMullin, Esq., Grand Junction, Colo., and John P. Helman, Esq., for the petitioner. Gene W. Reardon, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, J.: In this proceeding respondent determined deficiencies in income and excess-profits tax and petitioner claimed overpayments of such taxes for the years and in the amounts indicated as follows: Over-
Deficiency
payment
1937
Income
$2,906.04
$144.80
1937
Excess-profits
1,528.64
101.80
1938
Income
357.07
86.11
1938
Excess-profits
389.53
60.70
The questions now in issue relate to petitioner's exemption from taxation as a cooperative for the year 1937 under section 101 (12) of the Revenue Act of 1936, and for 1938 and, in the alternative for 1937, whether respondent erred in failing to allow certain sums as deductions as members' patronage savings. Findings of Fact Petitioner was incorporated on January 15, 1937, under the "Cooperative Marketing Act" of Colorado, with its principal place of business at Grand Junction, Colorado. Its income tax returns were filed with the collector of internal revenue at Denver, Colorado. Its authorized capital was 15,000 shares *492 of common stock with par value of $5 per share. Issuance of these shares was authorized to actual producers or agricultural products, the holders of such stock being petitioner's members. Its stated purposes, as set out in its Articles of Incorporation were, inter alia, "to assist and encourage the business of producing and marketing agricultural products in a profitable manner for its membership; and to engage in any other activities in connection therewith; to become a bargaining agency for the marketing of the agricultural products produced by its members; * * * [and] to purchase supplies for its membership." Article II, dealing with "Purposes and Powers" concluded: The Association is hereby authorized to handle the products of non-members, but in such event the Association shall not handle for non-members a volume of products greater in the aggregate than the aggregate of products handled by it for its own members. Petitioner's by-laws, adopted February 13, 1937, provided that any producers in an accepted geographical area could become members by subscribing to at least two shares of common stock and agreeing to take four additional shares annually until twenty shares were *493 acquired, and entering into the marketing agreement on the prescribed form. In Article XI thereof they provided further, as follows: (1) This is a non-profit association organized for the mutual benefit of its members only as producers. Members of a cooperative must have a financial interest in their Association sufficient in the aggregate to pay for all necessary property and facilities needed to efficiently handle the products of members and to provide a reasonable amount of operating capital and reserve. Beyond these items the Association must not go and when the necessary amount of capital has been paid in to meet the above requirements, then the Association shall pro-rate annually, all income in excess of the costs of operating and maintaining the Association, such pro-ration to be made to each member in the proportion that his annual business bears to the total annual business of the Association. Nominal interest (Not to exceed 6% per annum) may be paid to members on their common stock as interest on member investment in the business, if earned by the corporation and after all mortgaged indebtedness of the corporation is paid. In order to provide a fund from which such interest *494 may be paid, the Board of Directors may, from time to time, make provision for setting aside funds for this purpose. * * *
(4) All returns to members of this Association shall be based on the net proceeds from each of the said pools, less all charges provided in the Producers Marketing Agreement and these By-Laws. depending on the value of the products delivered by them to the Association for each of the said pools. In addition to the deductions provided for in the Producer's Marketing Agreement, the Board of Directors in their discretion may deduct, not to exceed two percent (2%) to be placed to the credit of such reserves as may be designated from time to time by the Board of Directors. (5) Any and/or all amounts deducted as aforesaid, except for reserves, which have not been used during any year may be placed by action of the Board of Directors to the credit of the reserve fund of the Association. Such amounts deducted as aforesaid, except for reserves remaining at the end of any year, which have not been placed by action of the Board of Directors in such reserve fund by the Association shall be prorated among the members delivering products in such year on the basis of the *495 products delivered, all as determined by the Board of Directors. (6) Reserves as above authorized may be used by the Association for any business operations or other proper purposes. Such reserves shall be distributed in whole or in part only in such manner and at such times as the Board of Directors may deem advisable, but the interest of each member in such reserves as may be distributed, shall be in proportion to his contribution thereto. Petitioner, on financing from the Cooperative Bank of Wichita, Kansas, had acquired facilities at Grand Junction, Clifton, and Palisades, shipping points in the Grand Valley, Colorado. The authorized "Producer's Marketing Agreement" stated, inter alia: 3. * * * (d) The Association agrees to pay the Producer from the sale of fruits and/or vegetable crops and products delivered to the Association, the net amount received therefrom after deduction the costs of maintaining and operating the Association, and the costs of freight, insurance, handiling, grading, packing, icing, and any other marketing costs of such fruits and/or vegetables, and such additional amounts as shall be necessary to equalize returns on all pools sold, and to maintain *496 proper differentials between the different randes and qualities of the fruits and/or vegetables in a particular pool. The Board of Directors in its discretion may make an additional deduction of not to exceed two (2) percent of the gross sale price for a reserve fund, which reserve may be used by the Association for any legitimate purpose. Payments to Producers shall be made as promptly as possible after sales proceeds are received by the Association. (e) The Association agrees that any and/or all amounts deducted as aforesaid, except for reserves, which have not been used during the year, shall be prorated (after the end of the year) among the members delivering fruits and/or vegetable products in such year on the basis of the products delivered, all as determined by the Board of Directors, provided, however, that no refunds shall be made to any member who violates this contract. When the shipping season began in 1937 petitioner had 141 paid-up members and 32 subscribers, all of whom had signed said marketing agreements. It was represented to the producers that it was a members' organization and that the savings were to go to them proportionately to the amount of produce shipped; *497 that there would be no deductions except for actual expenses and depreciation; that a deduction for a reserve would be in the discretion of the board of directors. No representation was made that the directors had any discretion as to whether they would or would not allocate the savings to members. The two platforms at Palisades and Clifton shipped 95 percent of the entire tonnage handled by petitioner. In 1937 there were 24 non-member shippers who paid handling charges aggregating $399.40 out of $26,990.90 total handling charges paid petitioner during that year. In 1938 there were 57 who paid handling charges aggregating $767.11 out of $18,797.31 total handling charges paid petitioner during that year. Petitioner sold merchandise to 199 non-member customers in 1937 and to 350 non-member customers in 1938. Petitioner on its organization had acquired the copyrighted "Mountain Lion Brand" label for fruit. This label was on the peach boxes of the former Grand Junction Fruit Growers' Association, the facilities of which petitioner had acquired. Petitioner had also acquired a label used by the Farmers' Union, a cooperative. These labels were used on the boxes which were in the growers' *498 sheds the year before, and petitioner shipped at least enough to use them up. There was no other cooperative at Grand Junction. Some of the non-members for whom shipments were made at Grand Junction had been patrons of the former Grand Junction Fruit Growers' Association, and they had the boxes left over with the labels on them. It was thought that the labels could not be used by anyone who did not hold the copyright and in order to save these growers from hardship their fruit was taken, and that if petitioner did not take the fruit, the growers would lose it. Petitioner's board of directors was composed of local farmers lacking in experience with cooperatives. The manager had but little experience. The Cooperative Bank at Wichita which was financing them was too remote to be of assistance. In 1937 petitioner's assistant manager gave its treasurer instructions with reference to savings and informed the treasurer's successor that a fund was set up under the name of "Operating Reserve" as a growers' patronage account to be kept intact and returned to them. The accounts for 1937 were audited by petitioner's auditor. Its treasurer, Townsend, prepared a report for that year showing *499 $272,370.03 as "the net amount received from the sale of produce." The report contained the following statement of "Income Account" for 1937: DR
CR
Miscellaneous Items
64.35
Miscellaneous Items
31.13
Expense
23,495.85
Bracing Materials
Grand Junction
476.72
Clifton
304.73
Palisade
849.25
Taxes
2,739.29
Interest
2,282.04
Depreciations
2,217.84
Cash, Long & Short
1.63
Supply Sales
Grand Junction
3,488.01
Clifton
995.68
Palisade
11,665.17
Handling Charges
26,990.99
Packing Plant
Tomatoes
1,248.50
Cantaloupes
121.29
Clifton
426.61
Sale of Salvage
50.00
Rental Income
1,106.00
Sales Tax
1.92
Overage on Fruit Account
32,431.70
46,549.96
32,431.70
14,118.26
An analysis of the "Expense" items was shown on the report as follows: General
G.J.
Clifton
Palisade
Total
Advertising
86.00
86.00
Auditing
45.88
45.88
Bank Service Charges
6.21
6.21
Cars and Trucks
583.94
583.94
Directors Fees
605.00
605.00
Donations
2.00
2.00
Drayage
23.00
15.75
19.60
58.35
Inspection
355.21
149.80
1198.15
1703.16
Insurance
200.15
300.46
84.22
542.44
1127.27
Labor
1630.21
1101.42
5467.97
8199.60
Legal
740.04
340.04
Light, Heat & Water
10.22
175.13
40.41
95.48
721.24
Miscellaneous
16.06
119.51
1.13
36.32
123.02
Office Supplies
469.03
479.03
Organization
192.50
162.50
Painting and Repairs
221.19
20.92
183.15
495.26
Postage
103.08
8.10
111.18
Salaries
8207.75
8207.75
Telegrams
51.80
51.80
Telephones
130.83
23.68
136.28
290.79
Trade Journals, Dues and Subscriptions
12.00
12.00
Travel - Entertaining
83.83
83.83
11415.49
2963.64
1437.33
7679.39
23495.85
*500 The item "Handling Charges," also shown in the "Income Account" was explained as follows: This is the income derived from the shipping of members' and non-members' produce. In connection with this, wish to say that the company retained or charged rates the same as other shippers and in view of this fact believe it is worthy of mention to say that we operated in this respect on a strictly competitive basis. For 1938 petitioner had total gross business of $256,405.82, of which not more than $153,074.36 was "the net amount received from the sale of produce." The treasurer's report for 1937 also showed aggregate net profit of "Operating Reserve" of $14,118.26. As to this the report stated: OPERATING RESERVE - 1937 This is the amount left at the close of 1937 belonging to the members of your company. However, it must be remembered that this amount will be subject to fluctuation for some time to come as there will be some adjustments on 1937 business that will have to be made. As an example, wish to say that your company will make application for exemption from Federal Income Tax, State Income Tax and other levies, and it will be some time yet before these matters are fully decided. *501 If it should be that this company will have to pay some of these levies on its 1937 income, then such assessments will have to be charged against that income. Likewise there may be some future recoveries on 1937 operations which will have to be credited on the Operating Reserve. I would suggest that the Board take all of these matters into consideration before setting up any patronage credits of any kind. * * * The report was considered by the board of directors, read at the annual February meeting of the membership, accepted and made a part of the petitioner's records. The growers were informed of the amount that would be distributed to them in accordance with the amount of produce they shipped. The amount of $14,118.26, which was generally understood as representing patronage savings for the benefit of the members, was the subject of discussion as to its distribution, but no conclusion was reached because no way was ascertained to allocate the savings in conformity with the interpretation placed on the cooperative laws. The board of directors construed Paragraph 3 (e) of the Marketing Agreement, supra, as empowering them to determine only the method of distribution. This *502 1937 balance of $14,118.26 was adjusted in 1938 to $14,121.26, by reason of small claims paid and received. The patronage saving for 1938 was $4,715.90 and was similarly treated, being credited to the "Operating Reserve" account. That account totaled $18,837.16 at the end of 1938. Operations for 1939 resulted in a loss of approximately $1,365. This and other items, including the transfer from the Operating Reserve Account to the Preferred Stock Account, hereinafter explained, created a debit balance in the Operating Reserve Account of $2,060.37 on December 13, 1940. No credits were made on petitioner's books in 1937 or 1938 reflecting in any patron's account his share of the net profits. The matter of payment of the profits remained under consideration until the fall of 1938 when the Cooperative Bank of Wichita sent out an expert who proposed a program which involved increasing petitioner's capital stock and adopting a new set of by-laws providing a method of paying the patronage dividends and creating a revolving fund plan. This program was adopted at the February 7, 1939, annual meeting. The pertinent by-laws then adopted were Nos. 9 and 10; they were expressly made retroactive to *503 the time of petitioner's organization and petitioner's books were ordered adjusted to conform with them. The amended by-laws 9 and 10 provided: No. 9. Apportionment of Earnings. The net earnings of the Cooperative shall be apportioned as soon as convenient after the close of each fiscal year upon the patronage basis and in accordance with the dollar volume of business transacted with the Cooperative by each member thereof; provided, however, that prior to such apportionment there shall be deducted therefrom not less than ten (10) percent thereof which shall be applied to the surplus or reserve funds of the Cooperative unless such surplus or reserve funds exceed fifty (50) per cent of the outstanding capital stock. The remaining net earnings shall be apportioned (1) by paying such dividends on the outstanding capital stock of the Cooperative as may be declared by the Board of Directors, not to exceed six (6) percent per annum, and (2) by paying all of the remaining net earnings to the members of the Cooperative on the basis of patronage as aforesaid either in cash, preferred stock or credits, at the sole discretion of the Board. The provisions of this By-Law and the one relative to *504 Capital Reserve Fund shall be retroactive to the beginning of the Cooperative and its books shall be adjusted to conform therewith. No. 10. Capital Reserve Fund. The Cooperative is authorized to apply any surplus of deductions made for any purpose and not used for that particular purpose during the current fiscal year to a capital reserve fund, and to issue certificates of preferred stock evidencing such earnings or savings made with patronage dividends which are in whole or in part so applied at the end of each fiscal year. Funds arising from the issue of such certificates may be used for creating a revolving fund for the purpose of building up such an amount of capital as may be deemed necessary by the Board of Directors from time to time and for revolving such capital; and such funds, or funds derived from any other sources, when in the opinion of the Board of Directors such funds are not necessary for the proper financing of its operations, shall be devoted to the refunding of the certificates, including certificates of preferred stock originally issued. All certificates of preferred stock issued in any one year shall be retired fully or on a pro-rata basis, only at the discretion *505 of the Board, in the order of issuance by years as funds are available for that purpose. The books and records of the Cooperative shall be kept in such a manner, by years, that the amount carried to general reserves accruing from patronage of each member of the Cooperative may be ascertained at any time. Whenever in a given year the operation of the Cooperative results in a net loss, such loss, to the extent that general reserves are available, shall be charged against the same and they shall thereby be reduced accordingly. The Board shall prescribe the basis on which the reserve contributions of members by years shall be reduced on account of any such loss, so that it will be borne by the members on as equitable a basis as the Board finds practicable. Whenever in the discretion of the Board the reserves are found to be in excess of the amount deemed reasonably necessary for the sound financial operations of the Cooperative, such excess shall be applied to paying off ratably, by years, the oldest unexhausted reserve contribution of members. Upon the dissolution or winding up of the Cooperative in any manner, after the payment of all debts and the retirement at par of all outstanding *506 capital stock, any balance remaining over shall be distributed ratably and proportionately to the members. In furtherance of the plan petitioner's authorized capital stock was increased to $100,000, composed of 1,500 shares of voting common of a par value of $10 per share and 85,000 shares of non-voting preferred of a par value of $1 per share. After the February 7, 1939, annual meeting the board of directors ordered the amounts due the members distributed under the provision of the new 1939 by-laws by the issuance of preferred stock. In computing the amount due each member petitioner's treasurer went through all the supply sales tickets and produce receipt tickets for the two years. Preferred stock amounting to $16,847 was issued and delivered in May, 1939, to member patrons as patronage rebates for 1937 and 1938. The sum of $106.44, representing fractional interests of $1 shares was credited and not issued. On December 31, 1939, a reserve of 10 percent ($1,883.72) for necessary purposes was charged to "Operating Reserve," resulting in a closing-out of that account. Nothing was done about patronage dividends to non-members, whose participation had not been contemplated. In August, *507 1939, petitioner's treasurer, whose employment dated from July, 1938, without specific authorization from petitioner's board of directors or advice from legal counsel, executed and filed an application for exemption under section 101 (12) of the 1936 Act (Form 1028). The application stated that no patronage dividends were paid to non-members and for this reason it was denied in December, 1939. Early in 1940, in accordance with instructions from the Collector, petitioner filed returns for 1937, 1938, and 1939, and paid $246.60 taxes for 1939 and $146.81 for 1938. The return for 1937 stated that 92.176 percent of its business was for its members and deducted 92.176 percent of $14,118.26, or $13,013.65 as a patronage reserve which it was stated "has since been refunded to the growers by the issue of Preferred Stock therefor." A deduction in the 1938 return of $3,215.26 was similarly computed and explained, the percentage factor there being 81.094 percent. Respondent has denied the right of petitioner to take the claimed deduction, and based his determination of deficiency in part thereon. After being advised by the revenue agent of the proposed adjustment, petitioner took legal counsel *508 and protested the denial of the deduction. On December 12, 1940, a special stockholders' meeting adopted a new by-law 9, which reads as follows: After ascertaining the net earnings of the Cooperative at the end of each fiscal year, a reasonable reserve of the Cooperative of not less than ten percent thereof shall be deducted and transferred to the surplus or reserve funds of the Cooperative, to be used by it for any necessary purpose until the said surplus or reserve fund shall equal 50 percent of the outstanding capital stock, but not thereafter. The remainder of said net earnings of the Cooperative, after providing for said reserve, shall be apportioned as soon as convenient after the close of each fiscal year upon a patronage basis and in accordance with the dollar business transacted with the Cooperative by each member thereof and by each non-member thereof, that part of such net earnings so apportioned to non-member producers shall be held for and paid to such non-member producers pro-rata on the dollar volume of business transacted by them with the Cooperative, either in cash, common or preferred stock or credits at the sole discretion of the Board. The member's net earnings *509 remaining shall be apportioned to the members of the Cooperative on the basis of the patronage aforesaid either in cash, common or preferred stock or credits at the sole discretion of the Board. This by-law shall be retroactive to January 1, 1940. On December 14, 1940, the board of directors authorized a transfer of $761.81 and $590 from the operating reserve to an "Apportionment of Patronage Dividends to Non-Member Producers" account to provide for patronage dividends for 1937 and 1938, respectively, to non-member producers. It also instructed the treasurer "if permitted by the income tax department" to charge this account with $246.60 and $146.81 being income and excess-profits taxes paid thereon for 1937 and 1938, respectively. The transfer was made from the 10 percent reserve account on the treasurer's own initiative because of the existence of a debit balance in the operating reserve account. Provision for payment of patronage dividends for 1937 and 1938 to non-member patrons was thereafter made. During the taxable years 1937 and 1938 there was neither a distribution of any part of petitioner's earnings to its non-member patrons, nor an existing obligation requiring it to *510 apportion or pay patronage dividends to its non-member patrons. The net earnings of petitioner corporation for 1937 and 1938 were neither credited, paid nor made available to its members and non-member patrons during those years. An allocation by By-Law 9 early in 1939 had no reference to allocation of dividends to non-members. The 10 percent reserve of $1,883.72 took ample care of dividends to non-members, ($1,351.81). This is the source from which it was paid. Petitioner's books were kept and its returns filed on an accrual basis. Respondent has now granted an application by petitioner for exemption effective since 1940. Opinion Petitioner's claim of exemption as a marketing cooperative, made only for the year 1937, is clearly untenable. In its most favorable aspect neither the organization nor the operation of petitioner made any provision during that year for the return to non-members of any portion of the profits resulting from the business done for them. Under Revenue Act of 1936, section 101(12), this omission is fatal to the privilege of statutory exemption. ; *511 . There is the further contention, however, that for both years petitioner was entitled to exclude from its taxable income all but a small portion of its apparent net profit on the ground that it was obligated to return to members any excess over the cost of operation. This was the principle followed by petitioner in filing its returns and paying its tax. While the record is not as complete and convincing as would have been desirable, it seems to us that this part of petitioner's argument is sound and should be sustained, though not to the extent urged by it. It is true that no patronage dividends were declared nor paid during either of the years in question and if the reliance were limited to that aspect, we should have to say that no certain obligation to make the payments rested upon petitioner and, accordingly, that the income was its own and should be treated as such for tax purposes. ;, *512 affirming ; . Such an approach, however, would overlook the provisions of the marketing agreement which the record shows was in effect as to each member. The contractual rights of the members derived from it and not from their stock ownership and resulted from the character and quantity of their business as producers and vendors and not from the amount or form of their stock ownership. Uniform Printing & Supply Co. v. Commissioner (C.C.A., 7th Cir.). . That arrangement not only required the petitioner "to pay the Producer from the sale of fruits and/or vegetable crops and products delivered to the Association, the net amount received therefrom after deduction [of] the costs of maintaining and operating the Association, and the costs of freight, insurance, handling, grading, packing, icing, and any other marketing costs * * *," but it was specified that "Payments to Producers shall be made as promptly as possible after sales proceeds are received by the Association." If petitioner conformed to the terms of this contract, *513 it was thus impossible for it to emerge from the process of marketing products with any profit which it was entitled to retain. Petitioner kept its books and made its returns on the accrual basis, and if it owed the proceeds to its members it could treat them as a liability, even though not paid. This statement must be qualified in two limited respects, first, that no such liability attached to the small percentage of nonmember business and, second, that there could be deducted a reserve fund of 2 percent of gross sales proceeds the return of which was not required. It is not clear that these two items are those which were taken into account by petitioner in returning its income and paying the tax thereon, but the figures appear and should be available for computation of the correct amount of tax if that has not been done. It is our conclusion that petitioner was taxable for both years. but that the amount of net income required to be returned should exclude all amounts resulting from member marketing business, except for the reserve fund item. Decision will be entered under Rule 50.